# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ELIZABETH KEPLEY,

        Plaintiff,

v.                                                                                              No. CIV 98-0490 BB/JHG

THE BOARD OF REGENTS OF THE
UNIVERSITY OF NEW MEXICO and
COSETTE WHEELER, in her official and
individual capacities,

        Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on a motion for summary judgment filed by Defendant Wheeler in her individual capacity (Doc. 22), as well as a motion for summary judgment filed by and dismissal filed by the Board of Regents (Doc. 26). Having considered the submissions of the parties and the applicable law, the Court will GRANT Wheeler's motion and GRANT in part and DENY in part the Board's ("Defendants") motion for summary judgment.

**Facts and Procedural History**

This case arises out of employment-related disputes between Plaintiff, a former employee of the University of New Mexico, and her superior, Dr. Wheeler. Plaintiff suffers from a mental condition known as cyclothymia. This condition remains essentially under control as long as Plaintiff takes her medication. While Plaintiff is pregnant, however, she does not take the medication unless the condition becomes serious enough that she poses a danger to herself or to others. During Plaintiff's first pregnancy she was hospitalized briefly due to suicidal ideation caused, at least in part, by the cyclothymia. In addition, during both of Plaintiff's pregnancies she has been afflicted with a physical condition called pre-eclampsia, which has required hospitalization. The cyclothymia and the

pregnancy-related complications are the bases for Plaintiff's Americans with Disabilities Act (ADA) claims.

Wheeler periodically had problems with Plaintiff's work throughout Plaintiff's tenure in Wheeler's laboratory, although Plaintiff contends she did receive positive evaluations on occasion. During Plaintiff's first pregnancy, she experienced the physical and emotional difficulties mentioned above. Wheeler allowed Plaintiff to stay overnight at her home at one point, gave her a baby shower, and granted her a post-birth leave of absence to which Plaintiff was not statutorily entitled. However, Wheeler also attributed Plaintiff's performance difficulties to Plaintiff's pregnancy.[1] When Plaintiff discovered she was pregnant for the second time, she feared Wheeler's reaction. Plaintiff kept her pregnancy hidden from Wheeler, and asked any fellow employees who knew about it to refrain from revealing the pregnancy to Wheeler.

As the pregnancy progressed, Plaintiff's physician decided Plaintiff should be off her feet as much as possible, to lessen the danger of pre-eclampsia. Plaintiff's attorney wrote a letter to Defendants' university counsel, requesting an accommodation that would allow Plaintiff to work at a position that did not require constant standing. Plaintiff was then assigned duties that, for the most part, allowed her to work while seated. In the meantime, Wheeler intensified efforts she had begun prior to the letter from Plaintiff's counsel, efforts designed to end Plaintiff's employment in Wheeler's laboratory. In response to these efforts, Plaintiff filed a claim with the EEOC and with the in-house Office of Equal Opportunity ("OEO"), alleging discrimination on the basis of disability and violation of the ADA.

---

[1] Defendants put a positive spin on this fact, noting that Wheeler could have terminated Plaintiff's employment during her probationary period, due to her poor work performance, but chose not to, explaining that the problems were likely due to Plaintiff's pregnancy. For purposes of this summary judgment motion, however, the Court is required to draw inferences from the evidence in the light most favorable to Plaintiff.

Ultimately, approximately two months after Plaintiff's counsel's initial letter to the University, Plaintiff resigned her employment, maintaining she could no longer work under Wheeler's constant harassment. Plaintiff subsequently filed this lawsuit, raising several causes of action. Plaintiff has sued Wheeler individually for violation of Plaintiff's First Amendment rights. She has also sued Defendants for violation of the ADA, and for retaliatory termination by means of a constructive discharge. As noted above, Wheeler and Defendants have moved separately for summary judgment.

**Standard of Review**

"Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." Id. "Nevertheless, a jury question does not exist because of the presence of a mere scintilla of evidence; rather, there must be a conflict in substantial evidence to create a jury question." *Walker v. NationsBank of Florida*, 53 F.3d 1548, 1555 (11th Cir. 1995). On a motion for summary judgment, the issue is "not whether [the court] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court will consider the motions for summary judgment in light of these standards.

**Discussion**

**A. First Amendment Claim Against Wheeler**

To establish a First Amendment retaliation claim against an employer, the employee must first establish that she engaged in protected speech involving a matter of public concern, and not merely a personal issue internal to the workplace. *Moore v. City of Wynnewood*, 57 F.3d 924, 931 (10th Cir.

3

1995). The determination as to whether the speech involves a matter of public concern is a question of law for this Court. *Johnsen v. Independent School Dist. No. 3*, 891 F.2d 1485, 1489 n. 3 (10th Cir. 1989).

Plaintiff maintains her filings with the EEOC and the OEO constitute her protected speech, and argues both complaints involved matters of public concern. She contends eradication of discrimination against the disabled is a matter of public concern, and her complaints thus were inherently and inextricably tied up with a matter of public concern. The Court disagrees. According to clear Tenth Circuit precedent, an EEOC charge or internal complaint that does no more than raise an individual employee's grievance is not considered a matter of public concern. *See, e.g. David v. City and County of Denver*, 101 F.3d 1344, 1356-57 (10th Cir. 1996); *Woodward v. City of Worland*, 977 F.2d 1392, 1403-04 (10th Cir. 1992). This is so even if the plaintiff's complaint involved sexual harassment, an issue that is clearly of as much general public concern as discrimination against disabled individuals. *Id.* Thus, it is not the topic of the EEOC charge or internal complaint that is determinative; instead, the Court must examine factors such as the purpose behind the filing, the extent to which the filing discusses a general failure to discharge official responsibilities rather than an individual grievance, and the forum chosen for the filing. *David*, 101 F.3d at 1355. In other words, the Court must determine whether the speech involved in this case was calculated to redress personal grievances, and therefore was spoken as an employee, or to address a broader public purpose, and therefore was spoken as a citizen. *Id.*

The evidence in this case regarding the EEOC and OEO filings is undisputed. Both charges were designed to redress Wheeler's poor treatment of Plaintiff individually. Neither raised issues of broader concern, such as a general climate of discriminatory behavior in the laboratory. Furthermore, Plaintiff's speech was limited to the relatively private arenas of the EEOC and the OEO, unlike other cases in which the speech has been found to be a matter of public concern. *See, e.g., Moore*, 57 F.3d

932 (statements at city council meeting involved matters of public concern because they were uttered in a public forum and informed the public on an important subject). The only subject discussed in Plaintiff's filings was the alleged discrimination she was suffering as an individual. This type of speech is not a matter of public concern and is not protected by the First Amendment. Therefore, Wheeler's motion for summary judgment will be granted and Plaintiff's First Amendment and § 1983 claim will be dismissed.

### B. Defendants' Summary Judgment Motion

Defendants raise several arguments in support of their motion. First, they claim Plaintiff does not have a disability that is protected under the ADA. Second, they argue Plaintiff did not adequately request accommodation under the ADA, so there can be no liability for failure to accommodate. Third, they contend there is insufficient evidence of a discriminatory or retaliatory motive for the actions taken against Plaintiff by Wheeler. Finally, they maintain the workplace conditions were not so severe as to justify Plaintiff's resignation, and accordingly no constructive discharge occurred in this case.

**1. Existence of a Disability -- Pre-eclampsia:** Under the ADA, a "disability" is a physical or mental impairment that substantially limits one or more of the major life activities of the individual. *Pack v. Kmart Corp.*, 166 F.3d 1300, 1304 (10th Cir. 1999). The existence of a disability, or lack thereof, must be determined on an individualized, case-by-case basis. *Id.* The two impairments claimed by Plaintiff in this case are her pre-eclampsia, a physical condition, and her cyclothymia, a mental condition. Defendants have not argued that either condition does not qualify as an impairment. Instead, with respect to the pre-eclampsia, Defendants argue Plaintiff was not actually suffering from the condition at the time she requested her accommodation, so the condition could not have substantially limited a major life activity at that point. Defendants also argue the condition was temporary, lasting only so long as Plaintiff was pregnant.

5

It is true that, as of October 15, 1997 (the date Plaintiff's counsel first informed Defendants of Plaintiff's pregnancy and need for accommodation), Plaintiff had not yet developed pre-eclampsia in her second pregnancy. In fact, she did not develop the condition until after she left her employment with Wheeler's laboratory. However, she had been hospitalized for the condition during her prior pregnancy, and her doctor wrote a statement indicating she was at high risk for again developing complications. Her doctor also recommended that she work at a job where she could sit for the majority of the day. One question before the Court, therefore, is whether a person who is at high risk of developing complications unless her behavior is changed, but who has not yet developed such complications, is precluded as a matter of law from qualifying as "disabled" for ADA purposes. The Court finds to the contrary. Plaintiff's risk of developing the condition was high enough and immediate enough that a physician recommended a major change in behavior, substantially restricting Plaintiff's activities. In addition, the risk had been demonstrated to occur previously under the same circumstances (pregnancy). Also, although the evidence on this point is slight, it appears that the risk of developing pre-eclampsia arose due to the nature of Plaintiff's physiology, indicating some sort of physical condition or impairment was the cause of the risk.[2]

This is not a case, for example, where a physician has informed a patient he is at risk of developing heart disease at some point in the future, and must exercise more or cut out certain foods. Instead, the risk in this case was immediate, potentially severe, and caused by certain well-defined conditions. At this stage, at least, the Court finds there is a genuine issue of fact as to whether the risk of developing pre-eclampsia, as opposed to the actual condition itself, can qualify as an impairment substantially limiting one or more of Plaintiff's major life activities. *Cf. Soodman v.*

---

[2]More information on this point will be necessary in order for Plaintiff to prevail at trial. For example, the Tenth Circuit has pointed out that "characteristic predisposition to illness or disease" is not an impairment. *Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 899 (10th Cir. 1997). It will be necessary for Plaintiff to distinguish her condition from mere susceptibility to illness, in order to have this claim submitted to a jury.

*Wildman, Harrold, Allen & Dixon*, 1997 WL 106257 (N.D. Ill.) (pregnant woman with condition endangering the pregnancy, and restricted to bed rest as a result, was disabled for ADA purposes); *compare Gudenkauf v. Stauffer Communications, Inc.*, 922 F.Supp. 465, 473 (D.Kan. 1996) (physiological conditions and changes related to pregnancy are not impairments unless they exceed normal ranges or are attributable to some disorder). As noted above, more information concerning the nature of pre-eclampsia and the causes of its appearance will be helpful at trial in determining whether the claim should be submitted to the jury.

Defendants also argue that the pre-eclampsia did not substantially limit a major life activity because its duration was limited to Plaintiff's pregnancy. Some courts have accepted this argument, and held that conditions lasting only during pregnancy do not constitute disabilities because they have no long-term or permanent impact. *See, e.g., Lacoparra v. Pergament Home Centers, Inc.*, 982 F.Supp. 213, 228 (S.D.N.Y. 1997). Other courts have impliedly rejected such a position. *See Soodman*. Again, the Court does not believe this question can be resolved as a matter of law. The Tenth Circuit has indicated that conditions lasting at least several months, if severe, may rise to the level of a disability. *Aldrich v. Boeing Co.*, 146 F.3d 1265, 1269 (10th Cir. 1998) (quoting the EEOC's Interpretive Manual). Plaintiff's doctor recommended sitting for most of the work day starting in mid-October 1997, while Plaintiff still faced over five months before her due date. The Court finds there is a fact issue as to whether a condition (or high risk of a condition) lasting five months, severe enough to require modification of Plaintiff's work and to pose a substantial danger of hospitalization,[3] is of sufficient duration and severity as to qualify as a disability under the ADA.

The final question with regard to the pre-eclampsia issue is whether there was a substantial limitation on a major life activity. Such activities include working, standing, and reproduction. *Pack*,

---

[3]Again, more information on these points will be necessary at trial. It is not clear how urgent the doctor's "recommendation" was, or how high the danger of hospitalization was. At this point, however, the Court is viewing the evidence in the light most favorable to Plaintiff.

7

166 F.3d at 1305. There is a genuine issue of fact as to whether the pre-eclampsia substantially limits one or more of these activities. Therefore, the Court finds Plaintiff's claims should survive summary judgment on the question of whether the pre-eclampsia could constitute a disability under the ADA.

**2. Existence of a Disability – Cyclothymia:**

There is no dispute that, when Plaintiff takes her medication regularly, her cyclothymia remains under control and does not affect Plaintiff's major life activities in any significant manner. The condition alone, therefore, cannot be considered a disability for ADA purposes. *See Sutton*, 130 F.3d at 902 (determination of whether a condition substantially limits a major life activity must take into account mitigating or corrective measures utilized by the individual). Plaintiff's argument, therefore, is that her mental condition becomes disabling when she is pregnant and unable to take her medicine.[4] Defendants, accordingly, make the same argument with respect to this condition as they did regarding the pre-eclampsia – that the condition is only temporary and therefore cannot substantially limit any major life activity. For the reasons discussed above, the Court rejects this argument. If the cyclothymia has severe consequences when it is left uncontrolled, the fact that its uncontrolled state might last for several months indicates it could be considered disabling for ADA purposes.

Defendants also argue there is no evidence the cyclothymia, even in its uncontrolled state, had any substantial effect on a major life activity. This argument has more force. According to the testimony of Plaintiff, the most significant effects of the cyclothymia included mood swings, some depression, sleeplessness, and a lack of concentration. Plaintiff's doctor, however, specified the

---

[4]There is evidence that Plaintiff did begin to take her medicine again, when her second pregnancy became advanced and she feared another suicidal episode like the one she suffered during her first pregnancy. For purposes of this motion, however, the Court assumes it is medically preferable that Plaintiff not continue to take her medication during pregnancy, and need not address the issues raised by the fact that Plaintiff's abstinence during the pregnancy may have been voluntary rather than necessary.

sleeplessness as an inability, at times, to sleep more than five hours per night, leaving Plaintiff sleepy in the afternoons. The doctor also testified she could identify no accommodation for the cyclothymia, because a person's mental status or ability to concentrate normally fluctuates during the day, and can be boosted by activities such as having a cup of coffee. There was no testimony that the suicidal episode endured by Plaintiff during her first pregnancy was a common or expected occurrence when cyclothymia is left unmedicated.

Plaintiff's evidence regarding the cyclothymia, therefore, is quite different than the evidence concerning the pre-eclampsia. Without medical evidence concerning the risk of a recurrence of serious psychological harm, the Court must focus only on the harm actually caused by the cyclothymia during the time period involved in this lawsuit. That evidence falls far short of what is necessary to show a substantial limitation on a major life activity. For example, the Tenth Circuit has recently determined that the ability to concentrate is not a major life activity. *Pack*, 166 F.3d at 1305; *see also Sasko v. Penn-Del Directory Co.*, 7 A.D.D. 1201 (E.D.Pa. 1997) (inability to get sound night's sleep and report to work on time and clear-headed insufficient). Plaintiff's testimony concerning her inability to concentrate, therefore, does not significantly impact on this case.[5] Furthermore, the general testimony about Plaintiff's sleeplessness does not meet the minimum standards established in *Pack* regarding sleeplessness as a substantial limitation on a major life activity. Plaintiff presented no evidence regarding the ability to sleep of an average person in the general population, and her evidence of sleeplessness was if anything less documented and less specific than that presented by the plaintiff in *Pack*. 166 F.3d at 1306. In sum, Plaintiff's evidence shows that during her second pregnancy, unlike her first, there was no substantial, as opposed to

---

[5]The Court has considered the possibility that Plaintiff's episodic inability to concentrate, due to sleeplessness, might substantially limit her ability to work. Plaintiff presented no evidence concerning the nature or number of jobs she would not have been able to perform, and her showing on this point was completely deficient.

9

minor, limitation on any major life activity. For these reasons, Plaintiff has failed to present sufficient evidence to survive summary judgment on the issue of whether her cyclothymia should be considered a disability for ADA purposes. The Court will grant Defendants' motion so far as the claimed mental disability is concerned.[6]

**3. Failure to Accommodate:** Plaintiff's attorney notified Defendants on October 15, 1997, that she needed to be assigned to job duties requiring little standing, for the duration of her pregnancy. Plaintiff's duties were changed, for the most part, to accommodate this request. The only other accommodations now argued by Plaintiff as necessary (although not requested in her attorney's October 15 letter) are a transfer to a different position in the University, where Wheeler would not be Plaintiff's supervisor, and a flexible schedule that would essentially allow Plaintiff to call in on any day and postpone her arrival time, to ensure she could sleep later. There was no evidence, however, that either of these accommodations concerned Plaintiff's pre-eclampsia. Instead, they are relevant only to her cyclothymia, which the Court has already determined was not a disability for ADA purposes. The Court will therefore grant Defendants' motion for summary judgment on the failure-to-accommodate claim, as Defendants gave Plaintiff the only accommodation she requested for her pre-eclampsia.

**4. ADA Retaliation or Discrimination:** In order to establish a claim for retaliation under the ADA, a plaintiff must show she engaged in protected activity, she suffered adverse action by the employer either after or contemporaneous with her protected activity, and there was a causal connection between the plaintiff's activity and the employer's adverse action. *Morgan v. Hilti*, 108 F.3d 1319, 1324 (10th Cir. 1997). There is no question that the letter written by Plaintiff's counsel

---

[6]The Court notes Plaintiff's argument that the cyclothymia should be considered in conjunction with the pre-eclampsia, rather than separately. However, because the pre-eclampsia was only a risk, not a reality, during the time in question, there was nothing for the cyclothymia to act with in a synergistic manner. The Court therefore rejects this argument.

10

to Defendants, requesting accommodation for her pregnancy complications, as well as Plaintiff's EEOC and OEO complaints, constituted protected activity. In addition, as discussed below, there is adequate evidence of adverse employment actions taken close in time to the protected activity. The only question with respect to the retaliation claim, therefore, is whether Plaintiff has adduced sufficient evidence to survive summary judgment on the causation issue.

To prevail on an ADA discrimination claim, a plaintiff must prove she is disabled for ADA purposes, is qualified for the position she occupies, and has suffered an adverse employment action because of her disability. *Sutton*, 130 F.3d at 897. In this case, the Court has already held Plaintiff has raised a genuine issue of material fact regarding the existence of an ADA disability, and Plaintiff has presented evidence of adverse employment actions. As with the retaliation claim, therefore, the sole question to be decided is the extent to which Plaintiff has provided evidence showing the adverse actions were motivated by an intent to discriminate on the basis of disability.

The causal-connection question crucial to both claims is analyzed under the well-established *McDonnell Douglas* test utilized in situations such as this one. *See King v. Preferred Technical Group*, 166 F.3d 887, 892 (10th Cir. 1999). Under the *McDonnell Douglas* test, a plaintiff must first establish a prima facie case of discrimination or retaliation. The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. Finally, assuming the respective parties have carried their burdens in both of the previous steps, the plaintiff will be required to show the defendant's explanation for its actions is a mere pretext for retaliation or discrimination. *Id.*

On the retaliation claim, Plaintiff has presented evidence of a flurry of negative job-related memoranda and actions immediately following her attorney's October 15 letter to Defendants. For example, on October 23 she was told she could only take two days of annual leave for a trip she had planned, instead of the three she needed to accommodate her already-purchased airline tickets, even

though she had obtained prior verbal approval of the annual leave. On October 24, 27, and 31, as well as November 5, 6, and 13, Wheeler "wrote up" Plaintiff for various work-related problems, such as following improper procedures, keeping inadequate notebooks, failing to follow instructions, and insubordination. On November 12, Plaintiff was docked for 40 hours of excess sick leave she had taken, and was not given an opportunity to substitute annual leave, which would have lessened the financial impact of the action.[7]

Normally a showing of this level of adverse activity closely following an employee's protected activity is sufficient to establish a prima facie case of retaliation. *See King*, 166 F.3d at 893 (temporal proximity between protected activity and an adverse employment action may generally establish a causal link between the activity and the adverse action). One difficulty for Plaintiff in this case, however, is that Wheeler began her efforts to rid her laboratory of Plaintiff <u>before</u> she knew of the pregnancy, and <u>before</u> Plaintiff's first protected activity. In the record submitted to this Court is a memorandum from Wheeler, dated September 23, 1997, in which she requests assistance from the Human Resources manager in terminating Plaintiff from her position in the laboratory, due to perceived performance problems. At around this same time, Wheeler instructed another lab employee not to interview Plaintiff for a different position in the laboratory. Also, on October 3, Wheeler sent an e-mail in which she indicated her desire to begin progressive discipline leading to termination of Plaintiff as an employee. All these actions, as noted above, were taken before Plaintiff engaged in any protected activity and before Wheeler knew Plaintiff was pregnant.

Where discipline of an employee has begun prior to the employee's protected activity, and further disciplinary action taken after the protected activity simply completes the disciplinary process already set in motion, the temporal proximity between the protected activity and the disciplinary

---

[7]The Court again points out that these facts are as alleged by Plaintiff, accepted for purposes of these motions only, and nothing in this opinion should be construed as establishing facts for purposes of a subsequent trial.

action does not necessarily lead to an inference of improper motive. *Morgan,* 108 F.3d at 1324. There is a close question in this case, therefore, whether Plaintiff has made the required *prima facie* showing of retaliatory or discriminatory motive. Since Wheeler strongly indicated her desire to terminate Plaintiff's employment prior to the protected activity or knowledge of a possible disability, and took concrete steps to accomplish that result, the flurry of disciplinary actions taken soon after October 15 is not sufficient, standing alone, to raise an inference of illegal motive. *Id.* However, Plaintiff has also submitted evidence indicating Wheeler reacted quite negatively when she learned of Plaintiff's protected activity, particularly the EEOC and OEO claims. Plaintiff allegedly overheard Wheeler complaining that she now could not "get rid" of Plaintiff, and that the situation is "money in her pocket."

Admittedly, the alleged statements by Wheeler are susceptible of more than one inference. However, given the numerous instances of disciplinary action taken after October 15, and the evidence of Wheeler's negative reaction to Plaintiff's protected activity, the Court finds there is a question of fact as to whether the actions taken against Plaintiff were motivated, at least in part, by retaliatory motives. The Court therefore determines Plaintiff has established a *prima facie* case on the retaliation claim.

On the other hand, there is no evidence that Wheeler's actions were motivated by a more general motive to discriminate on the basis of Plaintiff's disability. Plaintiff has presented no evidence that similarly situated non-disabled employees were treated differently than she was. She has also presented no evidence indicating Wheeler had any negative reaction toward her cyclothymia or pre-eclampsia. For example, there is no evidence indicating Wheeler was perturbed by the need to accommodate Plaintiff by allowing her to work at tasks she could perform while seated. The only evidence Plaintiff has submitted in support of this claim is her showing that adverse employment actions were taken against her closely following Wheeler's discovery that she was pregnant and

13

requesting an accommodation.[8] However, as pointed out above, the temporal proximity between Wheeler's first knowledge of Plaintiff's possible disability and the subsequent disciplinary actions is insufficient, standing alone, to raise an inference of discriminatory motive. In short, unlike the retaliation claim, with respect to the discrimination claim Plaintiff has not produced the additional evidence she needed to survive summary judgment. Therefore, the Court will find Plaintiff has not met her burden of establishing a *prima facie* case of discrimination on the basis of disability.[9]

The next step in the *McDonnell Douglas* process (which has now been narrowed to apply only to the retaliation claim) is to determine whether Defendants have advanced a legitimate, non-discriminatory reason for Wheeler's actions. Defendants have clearly done so. There is evidence Wheeler was extremely upset in August 1997, because of Plaintiff's errors on a certain project. In fact, Wheeler "screamed" at Plaintiff in front of a third party. There is also evidence concerning other errors Plaintiff had made, throughout her tenure at the laboratory. Finally, there is the evidence recited above, concerning Wheeler's desire to terminate Plaintiff's employment due to Wheeler's perception of her as a poor employee, and Wheeler's determination to take steps to achieve that

---

[8]In this case, the first protected activity (the attorney's October 15 letter) is simultaneous with Wheeler's first knowledge of Plaintiff's disability. Plaintiff attempts to claim Wheeler knew of her pregnancy before October 15, and therefore knew of her disability before that date. However, her only evidence of that fact is her own unsupported assertion, which is based not on any fact but on pure supposition. Plaintiff argues, essentially, that everyone in the laboratory knew of her pregnancy, so Wheeler must have also. However, Plaintiff specifically instructed the other employees not to inform Wheeler of the pregnancy, and there is no evidence any of them disregarded her instructions. Therefore, there is no admissible evidence that Wheeler knew of the pregnancy before the October 15 letter. Furthermore, knowledge of the pregnancy does not translate to knowledge of the risk of pre-eclampsia. Even if Wheeler knew of Plaintiff's problems with pre-eclampsia during the first pregnancy, there is no evidence Wheeler knew anything about the risk of recurrence of that condition during a second pregnancy.

[9]Plaintiff points out that Wheeler blamed her early performance problems on her first pregnancy, indicating she had discriminatory attitudes toward pregnant employees. However, pregnancy is not an impairment under the ADA. *Sutton*, 130 F.3d at 899. This evidence, therefore, is not sufficient to raise an inference that Wheeler had a discriminatory attitude toward Plaintiff's disability, the pre-eclampsia arising out of her pregnancy.

result. Defendants, therefore, have advanced a legitimate reason for Wheeler's flurry of adverse employment actions – Plaintiff's allegedly severe deficiencies as an employee.

The burden next shifts back to Plaintiff to present evidence indicating the above "legitimate" reason was actually a pretext for retaliation. Again, it is quite debatable whether Plaintiff has adduced sufficient evidence to meet this burden. There is evidence, from Plaintiff's affidavit and deposition, disputing the legitimacy of the "write-ups" and other adverse actions taken by Wheeler after October 15. Thus, there is evidence from which a jury could reasonably infer that Wheeler was trumping up reasons to terminate Plaintiff's employment. The question is, however, whether there is sufficient evidence to show that Wheeler's motivation for the trumping up was retaliation for protected activity, or whether she was simply determined, by whatever means possible, to rid her laboratory of this problem employee. Again, given the evidence of Wheeler's outspoken negative reaction to Plaintiff's EEOC and OEO claims, the Court finds Plaintiff has raised an issue of fact concerning Wheeler's motives, sufficient to survive summary judgment. It is possible Wheeler was simply frustrated because she thought the letter from Plaintiff's attorney and the administrative process was going to hinder her efforts to terminate Plaintiff's employment. It is also possible, however, that Wheeler's subsequent adverse actions were motivated, at least in part, by her anger and frustration. For this reason, the Court will deny the summary judgment motion with respect to the retaliation claim.

**5. Constructive Discharge:** Defendants maintain Plaintiff quit her job without adequate justification, and refused to participate in mediation efforts proposed by the University. Therefore, argue Defendants, Plaintiff's constructive-discharge claim cannot withstand summary judgment. The Court disagrees. There was an almost-daily stream of memos concerning poor work performance, denial of previously-approved leave, refusal to substitute annual leave for sick leave, and loud negative conversations about Plaintiff. While it does not appear these incidents rise to the level of making the workplace so difficult that a reasonable person would feel compelled to resign, *See Burks*

15

*v. Oklahoma Publishing Co.*, 81 F.3d 975, 978 (10th Cir. 1996) (standard for constructive discharge), this constant stream of disciplinary memos and other adverse actions could reasonably lead Plaintiff to believe her employment was going to be terminated if she did not resign. This is especially true because Plaintiff knew, from overhearing Wheeler's telephone conversations, that Wheeler wanted to get rid of her.[10] Under these circumstances, Plaintiff could prove she was constructively discharged by showing she had no real choice but to resign or be fired. *See id.* In addition, as discussed above, there is a fact question as to whether the desire to terminate her employment was due, at least in part, to her protected activity. Finally, given Wheeler's adamant desire to terminate Plaintiff's employment and the numerous steps she took to accomplish that result, there is a question of fact as to whether Plaintiff was justified in refusing Defendants' offer of mediation, on the ground that such an attempt to resolve the situation would be futile. Therefore, summary judgment will be denied on this claim.

**Conclusion**

Based on the foregoing discussion, Plaintiff's First Amendment/Section 1983 claim will be dismissed. Also, her failure-to-accommodate claim and her claim of discrimination on the basis of disability will be dismissed, as will all portions of the ADA claims that are dependent on her cyclothymia rather than the pre-eclampsia. Plaintiff's retaliation claim, and the constructive-discharge claim arising out of the retaliation cause of action, will not be dismissed.

**O R D E R**

For the above stated reasons, the Court hereby GRANTS Defendant Wheeler's motion for summary judgment (Doc. 22); and GRANTS in part and DENIES in part Defendants the Board's motion for summary judgment (Doc. 26).

---

[10]It is not clear whether, at the time Plaintiff resigned, she was aware of Wheeler's memorandum and e-mail putting in writing her desire to discharge Plaintiff.

Dated at Albuquerque this 30th day of April, 1999.

**BRUCE D. BLACK**
United States District Judge

Counsel for Plaintiffs:
Donna L. Dagnall
Brian A. Thomas
Dagnall, Rames & Thomas LLC
1012 Lomas Boulevard, N.W.
Albuquerque, New Mexico 87102

Counsel for Defendants:
Paula Forney
Risk Management Division
P.O. Drawer 26110
Santa Fe, New Mexico 87502